

Tagged Opinion

**ORDERED in the Southern District of Florida on April 29, 2009.**

Paul G. Hyman, Chief Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | CASE NO.: 03-32827-BKC-PGH |
| **Friedlander Capital Management Corp.,** | Chapter 7 |
| Debtor. | |
| _____/ | |
| **Patricia A. Dzikowski,** | ADVERSARY NO: 05-03088-PGH |
| Plaintiff, | |
| v. | |
| **Carolee Friedlander and Carolee Designs, Inc.,** | |
| Defendants. | |
| _____/ | |

### MEMORANDUM ORDER

This matter came before the Court for trial on August 27, 2008 and January 22, 2009. On May 23, 2005 Patricia Dzikowski, as trustee ("Trustee") for Friedlander Capital Management Corporation

("Debtor"), filed a *Complaint to Avoid Fraudulent Transfers and for Monies Owed* ("Complaint") against Carolee Friedlander ("Ms. Friedlander") and Carolee Designs, Inc. ("Designs") (collectively, "Defendants").  The Complaint asserts the following three counts that seek: 1) avoidance of the Debtor's alleged fraudulent transfers under 11 U.S.C. § 544 and Connecticut General Statute § 52-552e(a)(1); 2) avoidance of the Debtor's alleged fraudulent transfers under 11 U.S.C. § 544 and Connecticut General Statute § 52-552e(a)(2); and 3) to the extent that the transfer of money to Defendants is not a fraudulent transfer, repayment of the transfer as a loan that is owed to the Debtor.  At trial, the Trustee only pursued counts two and three.  Also, at trial, Defendants' counsel stated, and the Trustee did not argue otherwise, that the alleged fraudulent transfer at issue was to Ms. Friedlander and not Designs.

## **FINDINGS OF FACT**

Burton G. Friedlander ("Mr. Friedlander") was the sole shareholder of the Debtor, a Connecticut corporation that managed a pooled investment fund ("Pooled Account"), and provided investment services and advice.  On May 23, 2003, the Debtor filed a voluntary Chapter 7 petition.  Mr. Friedlander also operated two hedge funds: Friedlander International Limited ("FIL"), a company incorporated in the Bahamas for which the Debtor was the investment

manager, and Friedlander Limited Partnership ("FLP"), a limited partnership formed under the laws of Connecticut for which the Debtor was the general partner. Friedlander Management Limited ("FML"), a company incorporated in the Bahamas, was the manager of FIL. In December 2001, a United States District Court for the Southern District of New York appointed a receiver for FIL, FLP, and FML.

From 1994 through 2001, Mr. Friedlander solicited investments from individuals and entities which were deposited into the Pooled Account. Mr. Friedlander controlled the investment decisions and the movement of all funds in the Pooled Account. In early 1998, Mr. Friedlander began commingling the funds deposited into the Pooled Account with funds from FIL, FML, and FLP, as well as his personal funds, and used the commingled funds for personal expenses, including country club fees, personal legal fees, sailboat maintenance and dockage fees, and condominium fees. Additionally, in February 2000, Mr. Friedlander issued check number 164 for $29,766 from an account owned by Mr. Friedlander and Ms. Friedlander (the "Joint Account") to reimburse the Debtor for purchasing Mr. Friedlander 2000 US Open tennis tournament tickets.

In June 2003, the Securities and Exchange Commission (the "SEC") charged Mr. Friedlander with violations of federal securities laws stemming from his operation of the Pooled Account and the other hedge funds. *Securities and Exchange Commission v.*

*Friedlander*, No. 01-CV-4596 (S.D.N.Y.). The same month, Mr.
Friedlander was indicted for criminal violations of securities laws
for the same conduct. *United States v. Friedlander*, No. 03-Crim-
1172 (S.D.N.Y.). In May 2005, Mr. Friedlander plead guilty to one
count of securities fraud relating to his operation of the Pooled
Account. When pleading guilty, he stated, in part:

> During the seven-year period, from 1994 to 2001, the
> funds of seven individuals and three entities were
> managed in a commingled pooled account. Beginning in
> 1996, I engaged in certain practices that operated to
> deceive investors whose money was maintained in the pool
> account fund. Specifically, I caused the investors to
> receive certain reports in the mail about their funds
> that I had reason to know were not accurate. These
> reports misrepresented the status and value of the
> investments.

Trial Tr. May 25, 2005 (Jt. Stip. Ex. 3.) In May 2005, Mr.
Friedlander paid restitution in the amount of $2,052,674.37 to the
United States Attorney for the Southern District of New York for
distribution to certain Pooled Account investors who did not
otherwise receive a return on their investment. The restitution
payment resulted in repayment of all sums due the Pooled Account
investors.

Ms. Friedlander is Mr. Friedlander's second ex-wife, having
divorced him in 2005, and was the sole shareholder of Designs, a
Connecticut corporation that was sold prior to the Debtor's
bankruptcy. At issue in this case, is the Debtor's alleged
fraudulent transfer of $500,000 to Ms. Friedlander. On or about

4

March 14, 2001, Mr. Friedlander withdrew $500,000 from the Debtor's account to provide Ms. Friedlander a one-month, interest-free loan, which was deposited into an account owned by Designs.  On April 11, 2001, in order to repay the loan, Ms. Friedlander wired $500,000 from an account owned by Designs to the Joint Account.  Thereafter, in April 2001, Mr. Friedlander transferred $50,000 from the Joint Account to the Debtor's account.  The parties agree that in April 2001, Mr. Friedlander paid $374,680.22 of the remaining $450,000 to his first ex-wife to settle a family court judgment against him.

It is undisputed that Ms. Friedlander never withdrew funds from the Joint Account.  It is likewise undisputed that except for the April 11, 2001 deposit of $500,000, Ms. Friedlander never deposited funds into the Joint Account.  The parties agree that Ms. Friedlander believed that the $500,000 loan was from Mr. Friedlander and that Ms. Friedlander believed she repaid the loan when she deposited $500,000 into the Joint Account.

According to the docket and claims register for the Debtor's bankruptcy case, twelve proof of claims were filed in the Debtor's bankruptcy case, of which four were disallowed and one was withdrawn.  The remaining seven claims consist of a landlord claim, a claim filed by the receiver appointed to FIL, a claim filed by the receiver appointed by FML, and four Pooled Account investor's claims.  The parties agree that no documentation has been attached to the landlord claim to indicate prima facie validity of the

landlord's claim for unpaid rent.  The Trustee has objected to the claims filed by FIL and FML on the basis that the claims are unliquidated, and appear to include unspecified damages which are not reimbursement for actual pecuniary loss.  The parties agree that the four claimants who were Pooled Account investors have received restitution payments.  At trial on August 27, 2008, the Trustee did not dispute the Defendants' attorney's statement that these four claimants received what the SEC and the United States Attorney determined to be full compensation.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).  This is a core proceeding pursuant to § 157(b)(2)(H).

### 1.    The Parties' Arguments

The Trustee seeks to avoid the Debtor's alleged fraudulent transfer pursuant to 11 U.S.C. § 544.  "Section 544(b) of the bankruptcy code permits a trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may have." *Gaughan v. Cavan (In re Strasser)*, 303 B.R. 841, 846 (Bankr. D. Ariz. 2004)(citations omitted).  The Trustee asserts that the Debtor made a fraudulent transfer under Connecticut General Statute § 52-552e(a)(2) when Mr. Friedlander withdrew $500,000 from the

6

Debtor's account to provide Ms. Friedlander a one-month, interest-free loan.  Pursuant to § 52-552e(a)(2):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation:
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor
>
> > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or
> >
> > (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. Ann. § 52-552e(a)(2)(2005).

Defendants do not dispute the Trustee's assertion that the applicable statute of limitation is four years,[1] or that the Trustee's claim is timely brought.  At trial, Defendants did not dispute that the transfer was made when the Debtor reasonably should have believed its debts were beyond its ability to pay as they became due.  Nor did Defendants dispute that the transfer was incurred without the Debtor receiving a reasonably equivalent value.  Instead, Defendants' defense is based upon the doctrine of reverse veil piercing.  The Defendants assert that Ms.

---

[1] "The applicable state law limitations period applies to actions brought under section 544(b)." 5 COLLIER ON BANKRUPTCY § 544.09 (15th ed. rev. 2008).  The statute of limitations "of four years contained in § 52-552j(2) applies to transfers made with constructive fraudulent intent under § 52-552e(a).(2)." *Conn. Nat'l Bank v. D'Onofrio*, 46 Conn. App. Ct. 199, 209 (1997).

Friedlander's payment of $500,000 to Mr. Friedlander constituted repayment to the Debtor.

### 2.   Theory of Reverse Veil Piercing

Corporate veil piercing is an equitable remedy.   Under traditional veil piercing, a party attempts to pierce the corporate veil in order to hold the corporate shareholders liable for the actions of the corporation.   Under reverse veil piercing, a party attempts to pierce the corporate veil in order to hold the corporation liable for the actions of the shareholders.[2]   Reverse veil piercing has been invoked in a handful of bankruptcy situations.   *See, e.g., Kendall v. Turner* (*In re Turner*), 335 B.R. 140 (Bankr. N.D. Cal. 2005)(advanced by trustee and creditors of shareholder's bankruptcy case to bring corporate assets into shareholder's bankruptcy estate); *In re Schwab*, 378 B.R. 854 (Bankr. D. Minn. 2007)(invoked by individual debtor to exempt property interests technically owned by debtor's corporation). There is scant case law, however, regarding the use of reverse veil piercing to defend against a fraudulent transfer claim.

In one similar case, Knowles, the sole shareholder, director and officer of the debtor, KZL Livestock, Inc. ("KZL"), used funds

---

[2] Reverse veil piercing has been divided into two types: 1) insider reverse piercing, which involves a controlling corporate insider seeking to disregard the corporation over the objections of a third party, and 2) outsider reverse piercing, which involves a third party seeking to disregard the corporation over the objections of the insider and the corporation. Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standard*, 16 J. Corp. L. 33, 37 (1990).

from KZL's account to repay his personal loan with a bank. *Barber v. Prod. Credit Servs. of West Cent. Ill. (In re KZL Livestock, Inc.)*, 221 B.R. 471, 474 (Bankr. C.D. Ill. 1998). The KZL trustee brought suit against the bank to recover the alleged fraudulent transfer, arguing that there was a transfer of KZL's property for less than reasonably equivalent value. *Id.* at 474, 476. The bank conceded that repayment of the loan involved a transfer of KZL's property. *Id.* at 477. However, the bank argued that under the theory of reverse veil piercing, the bank's loan to Knowles constituted a loan to KZL and consequently, KZL received reasonably equivalent value for its transfer to the bank. *Id.* at 477.

Under Illinois law, the KZL court stated that the bank could establish it gave reasonably equivalent value through the theory of reverse veil piercing if it proved: 1) that there was a unity of interest between KZL and Knowles, and 2) recognition of KZL's separate existence would cause an injustice. *Id.* at 478. Upon conducting a factual analysis, however, the Court concluded that the bank failed to prove these elements. *In re KZL Livestock*, 221 B.R. at 479.

### 3.  Choice of Law for Reverse Veil Piercing Analysis

State law governs the application of corporate veil piercing in the context of a bankruptcy transfer avoidance action. *Energy Smart, Inc. v. Musselman (In re Energy Smart, Inc.)*, 381 B.R. 359,

379 (Bankr. M.D. Fla. 2007); *In re KZL Livestock*, 221 B.R. at 478 (*citing Pajaro Dunes Rental Agency, Inc. v. Spitters* (*In re Pajaro Dunes Rental Agency, Inc.*), 174 B.R. 557 (Bankr. N.D. Cal. 1994); *Marquis Prods., Inc. v. Conquest Carpet Mills* (*In re Marquis Prods., Inc.*), 150 B.R. 487 (Bankr. D. Me. 1993)). Thus, as an initial matter, the Court must determine which state's law guides the Court's reverse veil piercing analysis. Defendants assert that Connecticut law applies. The Trustee contends that Florida law applies. Bankruptcy courts apply different approaches to choice of law issues. Because the result is the same under the three approaches discussed below, the Court declines to adopt a particular approach in this case.

### A.    Diversity Jurisdiction Approach

Under the diversity jurisdiction approach, bankruptcy courts borrow from the "law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law." *Marine Midland Bank v. Portnoy,(In re Portnoy)*, 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996)(citation omitted); *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998). In this case, the underlying rights and obligations are defined by state law because the Trustee seeks to avoid a fraudulent transfer under Connecticut law. Since Florida is the

forum, under the diversity jurisdiction approach, Florida choice of law rules would determine the state law applicable to the Court's reverse veil piercing analysis.

As to Florida's choice of law rules, "[c]laims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation." *Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (5th Fla. Dist. Ct. App. 2004)(relying on Restatement (Second) of Conflict of Laws §§ 302 and 309)(internal citations omitted). The Restatement (Second) of Conflict of Laws § 302 provides:

> (1) Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

> (2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 302 (1971).

Reverse veil piercing involves the internal affairs of the Debtor, mainly the rights and liability of the Debtor. The parties have not established, and no facts on the record indicate that this is an unusual case where some other state has a more significant relationship to the occurrence and parties. Accordingly, under *Chatlos Found., Inc. v. D'Arata* and § 302 of the Restatement

(Second) of Conflict of Laws, the local law of Connecticut - the state of incorporation - applies to the Court's analysis of Defendants' reverse veil piercing defense.  882 So. 2d 1023.

### B. Uniform Federal Common Law Approach

Under the uniform federal common law approach, a bankruptcy court applies federal, not forum state, choice of law rules. *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir.1995)(citations omitted).  "In general, a bankruptcy court's choice of applicable law 'requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states.'"  *In re Segre's Iron Works, Inc.*, 258 B.R. 547, 551 (Bankr. D. Conn. 2001)(*quoting Vanston Bondholders Protect. Comm. v. Green*, 329 U.S. 156, 162 (1946)).  In this case, the Debtor and Designs were incorporated in Connecticut and the Trustee seeks to avoid a fraudulent transfer under Connecticut law.  The Trustee presented no evidence to suggest that Florida has more significant contacts.  Consequently, under the uniform federal common law approach, the Court resolves that the law of Connecticut - the state with the most significant contact - applies.

C.    **Hybrid Approach**

Under a hybrid approach, courts first assess whether creation of federal common law, rather than application of the forum state's law, is appropriate because "[t]he ability of the federal courts to create federal common law and displace state created rules is severely limited." *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 606 (2d Cir. 2001). Before a bankruptcy court can create federal common law "'a significant conflict between some federal policy or interest and the use of state law must first be specifically shown.'" *Id.* at 606 (*quoting Atherton v. FDIC*, 519 U.S. 213, 218 (1997)). The parties do not assert, and there is not, any significant conflict between federal policy or interest, and the use of state law. As a result, the same analysis under Florida's choice of law rules discussed under the diversity jurisdiction approach would follow, rendering Connecticut law applicable.

Therefore, under the three choice of law approaches discussed above, the Court concludes that Connecticut law governs the Court's reverse veil piercing analysis.[3]

---

[3] The Trustee stated in its proposed memorandum of decision that the difference between Florida law and Connecticut law on the issue of reverse veil piercing appears negligible. The Court does not agree. While the Supreme Court of Florida has articulated an arguably similar *traditional* veil piercing standard as that applied in Connecticut, the relevant inquiry is whether Florida recognizes *reverse* veil piercing. *See Aztec Motel, Inc. v. State ex rel. Faircloth*, 251 So. 2d 849, 852 (1971) ("[C]ourts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation is a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual

### 4.    Reverse Veil Piercing Under Connecticut Law

Connecticut law recognizes the reverse veil piercing remedy. *Litchfield Asset Mgmt. Corp. v. Howell*, 799 A.2d 298, (Conn. App. Ct. 2002), *overruled on other grounds by Robinson v. Coughlin*, 266 Conn. 1, 9 (2003). "Pursuant to Connecticut case law, however, a court may properly disregard a corporate entity if the elements of *either* the instrumentality rule or identity rule are satisfied." *Id.* at 310 n.11. Reverse veil piercing is appropriate where the elements of one of the rules have been established and "when necessary to achieve an equitable result and when unfair prejudice will not result." *Id.* at 312. The applicable standard is a fair preponderance of the evidence. *Id.* at 310 n.12.

---

owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose").

The Third District Court of Appeal of Florida has recognized the reverse veil piercing remedy to the limited extent it is used "to hold the corporation liable for the debts of controlling shareholders where the shareholders have formed or used the corporation to secrete assets and thereby avoid preexisting personal liability." *Estudios, Proyectos e Inversiones de Centro Am. v. Swiss Bank Corp.*, 507 So. 2d 1119, 1120 (3d Fla. Dist. Ct. App. 1987)(affirming in part lower court's decision to grant lender a writ of attachment securing corporate assets where controlling shareholder-guarantor created corporation and transferred his ownership of property to defraud personal creditors); *Braswell v. Ryan Invs., Ltd.*, 989 So. 2d 38 (3d Fla. Dist. Ct. App. 2008)(denying reverse veil piercing remedy where the corporate act of taking title of asset preceded the existence of the claims and obligations sued upon). In this case, Defendants do not allege that they have a preexisting personal claim against the controlling shareholder, Mr. Friedlander. Nor do Defendants allege, and the evidence does not show, that Mr. Friedlander formed or used the Debtor to secrete assets to avoid preexisting personal liability. Consequently, under Florida law, the reverse veil piercing remedy is unavailable to Defendants.

### A.    Identity Rule

The identity rule requires that the proponent show

> that there was such a unity of interest and ownership
> that the independence of the corporations had in effect
> ceased or had never begun, an adherence to the fiction of
> separate identity would serve only to defeat justice and
> equity by permitting the economic entity to escape
> liability arising out of an operation conducted by one
> corporation for the benefit of the whole enterprise.

*Id.* at 315. "There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." *Id.*

In this case, Defendants proved by a preponderance of the evidence that there was such a unity of interest and ownership between Mr. Friedlander and the Debtor that the separate existence of the Debtor ceased. It is undisputed that Mr. Friedlander was the sole shareholder of the Debtor and that he controlled all investment decisions relating to the Debtor's Pooled Account. In early 1998, Mr. Friedlander caused the Debtor to cease investing the majority of funds deposited into the Pooled Account by investors. Instead, these funds were commingled with funds from FIL, FML, FLP, and Mr. Friedlander's personal funds. Mr. Friedlander used the commingled funds for unrelated business and personal expenses, including country club fees, personal legal fees, sailboat maintenance and dockage fees, and monthly condominium fees. Mr. Friedlander used only a small portion of the

15

Debtor's Pooled Account funds to repay investors. Furthermore, in March 2001, Mr. Friedlander withdrew $500,000 from the Debtor's account to provide the loan to Ms. Friedlander. Then, in April 2001, when Ms. Friedlander deposited $500,000 into the Joint Account to repay the loan, Mr. Friedlander deposited only $50,000 into the Debtor's account and used $374,680.22 to pay his first ex-wife to settle a family court judgment. Thus, the Court finds that Mr. Friedlander had complete domination over the Debtor's finances.

Defendants also proved by a preponderance of the evidence that Mr. Friedlander exercised complete domination over the Debtor's policies and practices as its sole shareholder. Beginning in 1996, Mr. Friedlander caused the Debtor to make material misrepresentations and omissions concerning the value of the Pooled Account's assets. Specifically, Mr. Friedlander prepared and distributed to investors false financial reports purporting to detail the performance of each investor's Pooled Account investment. The reports misrepresented the status and value of the investments.

The Trustee asserts that the act of the Debtor issuing financial reports tends to show that Mr. Friedlander treated Debtor as a separate entity. The Court does not find this argument persuasive. While the issuance of false reports may superficially indicate the Debtor existed apart from Mr. Friedlander, the stronger inference is that Mr. Friedlander held such domination

16

over the Debtor's policies and practices as to cause the Debtor to issue false reports.

The Trustee also argues that the lack of evidence of the Debtor's use of funds from the Joint Account tends to show that the Debtor existed apart from Mr. Friedlander. The Court does not find this argument persuasive or particularly relevant. Under Connecticut law, in order to establish reverse veil piercing, Defendants must prove that Mr. Friedlander had complete domination over the Debtor. Evidence that the Debtor exerted control over Mr. Friedlander, such as by the Debtor's use of the Joint Account, is not required.

Based on the foregoing, the Court concludes that Defendants have established by a preponderance of the evidence that Mr. Friedlander had complete domination over the Debtor's finances, policies, and practices. There was such a unity of interest and ownership between Mr. Friedlander and the Debtor that the independence of the Debtor ceased and it was rendered a mere conduit for Mr. Friedlander's fraudulent scheme. Because Defendants established the elements of the identity rule, application of reverse veil piercing is appropriate if "necessary to achieve an equitable result and when unfair prejudice will not result." *Howell, 799 A.2d* at 312. Accordingly, if equity so requires, the Court will apply the doctrine of reverse veil piercing to disregard the Debtor as a separate corporate entity.

17

### B. Reverse Veil Piercing is Necessary to Achieve an Equitable Result and Unfair Prejudice Will Not Result

Under Connecticut law, the guiding concept behind the reverse veil piercing doctrine is the need for the Court to "avoid an over-rigid preoccupation with questions of structure . . . and apply the preexisting and overarching principle that liability is imposed to reach an equitable result." *Id.* at 312 (citations omitted). The court in *In re KZL Livestock* declined to apply the reverse veil piercing remedy, in part, because the "paramount principal of the bankruptcy laws is equality of distribution of the assets of the estate" and to permit a single creditor to retain a substantial payment while other creditors share in the remaining assets would be unfair. 221 B.R. at 479. In *In re KZL Livestock*, the bank asserted reverse veil piercing as a defense to *retain repayment* of a loan. *Id.* at 477. In this case, however, Ms. Friedlander asserts reverse veil piercing as a defense, to render *payment already made* to Mr. Friedlander repayment to the Debtor. Application of reverse veil piercing will only relieve Ms. Friedlander of paying an additional $450,000 to the Trustee; it does not permit her to retain a substantial payment. Moreover, the general loss suffered by the Debtor's creditors as a result of the estate not receiving $450,000, is outweighed by the hardship Ms. Friedlander will suffer if required to shoulder the entire burden of paying an additional $450,000.

18

Of the twelve proof of claims filed in the Debtor's bankruptcy case, seven remain. As to the four claimants who were Pooled Account investors, Defendants' attorney stated at trial, and the Trustee did not argue otherwise, that they received what the SEC and the United States Attorney determined to be full compensation as a result of the $2,052,674.37 in restitution provided by Mr. Friedlander in May 2005. The remaining three claims consist of: 1) a landlord claim, to which the parties agree that no documentation has been filed to indicate prima facie validity, 2) the claim filed by the receiver appointed to FIL, which has been objected to by the Trustee, and 3) the claim filed by the receiver appointed to FML, which has also been objected to by the Trustee.

The parties' concurred that Ms. Friedlander never withdrew funds from the Joint Account and, except for the deposit of $500,000 to repay the loan, Ms. Friedlander never deposited funds into the Joint Account. The parties agree that of the $500,000, Mr. Friedlander deposited $50,000 into the Debtor's account and applied $374,680.22 towards payment to his first ex-wife to settle a family court judgment. The parties likewise agree that Ms. Friedlander believed that she borrowed the $500,000 from Mr. Friedlander and repaid the loan to Mr. Friedlander.

Based on these considerations, the Court concludes that equity sides with Ms. Friedlander. Therefore, the Court finds defensive application of reverse veil piercing appropriate because the

19

elements of the identity rule are satisfied, application is necessary to achieve an equitable result, and unfair prejudice will not result. The Court lastly notes that this case does not implicate the primary policy basis for rejecting outsider reverse piercing - protection of the investor's expectations of limited liability exposure. Crespi, *supra* note 2, at 64; *Howell*, 799 A.2d at 312 n.14. Mr. Friedlander was the Debtor's only shareholder. The Pooled Account investors did not purchase equity in the Debtor. The policy implicated in this case as to the investors - the policy of protecting investors from securities fraud - has arguably been properly addressed by the SEC, the criminal indictment, and the restitution provided by Mr. Friedlander.

### C.   Elements of Instrumentality Rule Not Established

Having decided that Defendants established the elements of the identity rule, the Court need not reach the instrumentality rule to adjudicate the matter. However, because Defendants also contend that they established the elements of the instrumentality rule, the Court will briefly address Defendants' arguments. The instrumentality rule requires proof of three elements:

> (1) Control, not merely majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the [principal] to commit fraud or wrong, to perpetrate the violation of a statutory or other positive

20

> legal duty, or a dishonest or unjust act in contravention
> of [defendant's] legal rights; *and* (3) that the aforesaid
> control and breach of duty must proximately cause the
> injury or unjust loss complained of.

*Howell*, 799 A.2d at 312 (citations omitted)(emphasis in original)
(alterations added); *Zaist v. Olson*, 154 Conn. 563, 575 (1967).

While the Court concludes that Defendants established the
first element, the Court finds that Defendants failed to establish
the remaining elements. As to the second element, Defendants argue
that Mr. Friedlander used Debtor to commit securities fraud upon
the Pooled Account investors, in contravention of their legal
rights. The investors, however, are not co-defendants in this
proceeding. As to the third element, Defendants assert that Mr.
Friedlander's control over the direction of the funds resulted in
the initiation of this adversary proceeding against Defendants.
The commencement of this adversary proceeding, however, is not
itself an injury or unjust loss. Nor does it flow from the
wrongful conduct asserted by Defendants under the second element.
As a result, Defendants fail to establish injury or unjust loss as
to them, and therefrom, proximate cause.

### D.    Full Repayment Defense

Application of reverse veil piercing renders Ms. Friedlander's
payment of $500,000 to Mr. Friedlander, repayment to the Debtor.
While the transfer of $500,000 from the Debtor's account to Ms.

Friedlander potentially constitutes a technical fraudulent conveyance under Connecticut General Statute § 52-552e(a)(2), the Court finds that Defendants successfully established the defense of full repayment to the proper entity.

## CONCLUSION

For the reasons stated above, the Court finds that under Connecticut law, Defendants have established the elements of the identity rule by a fair preponderance of the evidence, and because reverse veil piercing is necessary to achieve an equitable result and unfair prejudice will not result, the Court disregards the Debtor's separate corporate existence and concludes that Ms. Friedlander's payment of $500,000 to Mr. Friedlander constitutes repayment to the Debtor. As to the first count, the Court also finds in favor of Defendants because the Trustee did not present argument or evidence in support of a fraudulent transfer under § 52-552e(a)(1).[4]  The Court further finds that the Trustee presented no evidence to establish that Designs received either a fraudulent transfer or a loan from the Debtor.

---

[4] Section 52-552e(a)(1) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor.

Conn. Gen. Stat. Ann. § 52-552e(a)(1).

22

## <u>ORDER</u>

The Court, having considered the applicable law, the evidence presented at trial, the argument of counsel, the submissions of the parties, and being otherwise fully advised in the premises, hereby **ORDERS AND ADJUDGES:**

1.  The relief sought in Count One is **DENIED** because the Trustee presented no evidence or argument on the matter.

2.  The relief sought in Count Two is **DENIED** because the Debtor received full repayment for the transfer of funds.

3.  The relief sought in Count Three is **DENIED** because no portion of the loan remains unpaid.

4.  Pursuant to Federal Rules of Bankruptcy Procedure 9021, a separate final judgment shall be entered by the Court contemporaneously herewith.

###

Copies furnished to:

John L. Walsh, Esq.

Elisa R. Lemmer, Esq.

Elisa R. Lemmer, Esq. is directed to mail a conformed copy of this judgment to all interested parties not listed above.

AUST